UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| BOOTHBAY HARBOR SHIPYARD, LLC, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Docket no. 2:12-cv-005-NT ) |
| NORTH AMERICAN SPECIALTY INSURANCE COMPANY, | ) ) ) ) |
| Defendant. | ) |

## OPINION AND ORDER ON MOTION
## FOR PARTIAL SUMMARY JUDGMENT

This case comes before the Court on Defendant North American Specialty Insurance Company's ("**NAS**") motion, pursuant to Fed. R. Civ. P. 56, for partial summary judgment on Counts I and II of the Complaint. For the reasons discussed below, Defendant's motion for partial summary judgment is **DENIED**, and Plaintiff is **GRANTED** partial summary judgment on Counts I and II of the Complaint.

### BACKGROUND

In this insurance coverage action, Plaintiff Boothbay Harbor Shipyard, LLC (the "**Shipyard**") claims that its insurer, NAS, breached a duty to defend it in an underlying lawsuit, *Coastwise Packet Co. v. Boothbay Harbor Shipyard, LLC*, Docket No. 1:09-cv-10228-GAO (D. Mass.). According to the *Coastwise* complaint, in December of 2007, Coastwise Packet Co. brought the SHENANDOAH, a 108-foot wooden schooner, to the Shipyard for repairs. The contract price for the repairs was

$900,000, and the repairs were performed between December of 2007 and June of 2008.

Coastwise alleged that the repairs were performed negligently and claimed that the Shipyard breached its contract and various implied and express warranties. According to the *Coastwise* complaint, the SHENANDOAH started taking on water shortly after it was put back into service in the summer of 2008 as a result of the Shipyard's deficient repairs. Coastwise alleged damages including the vessel's loss of use and diminution in value, the cost of a marine surveyor, the cost of repair and restoration of the vessel, and the expenditure of additional time and effort by Coastwise's employees. Coastwise also claimed fraud, misrepresentation, and unfair and deceptive trade practices related to representations the Shipyard was alleged to have made to procure the contract for repairs.

Count I of the Complaint in the present case alleges that, by failing to defend the Shipyard in the *Coastwise* case, NAS is in breach of its contract of insurance with the Shipyard. Count II requests a declaration from the Court that NAS has a duty to defend the Shipyard in the *Coastwise* case. NAS claims that as a matter of law it has no duty to defend the Shipyard, and it moves for summary judgment on these counts.

The parties agree that the "facts" relevant to this motion consist solely of the allegations in the *Coastwise* complaint and the terms of the comprehensive general

liability ("**CGL**") insurance policy that Shipyard carried with NAS, effective December 1, 2007−December 1, 2008 (the "**Policy**").

## LEGAL STANDARD

This case is currently before the Court on NAS's motion for partial summary judgment. In a duty-to-defend case where the parties have stipulated to the relevant complaint and policy at issue, the question before the Court is one of law, and it is unnecessary to employ much of the ordinary mechanics of a Rule 56 motion. *See Mitchell v. Allstate Ins. Co.*, 36 A.3d 876, 879 (Me. 2011). Where there are no material facts in dispute, summary judgment is appropriate if the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). [1]

## DISCUSSION

Maine law, specifically the "comparison test" adopted by Maine's Supreme Judicial Court sitting as the Law Court, guides the analysis of whether NAS has a duty to defend the Shipyard in the *Coastwise* case. The basic principles of this test are firmly established:

> To determine whether an insurer has a duty to defend, we compare the allegations of the underlying complaint with the coverage provided in the insurance policy. Only the complaint and the policy are considered in determining whether the insurer has a duty to defend.
> This comparison test arises from our holding that the duty to defend is broader than the duty to indemnify, such that an insurer must provide a defense if there is any *potential* that facts ultimately

---

[1] The Plaintiff has not filed a cross-motion for partial summary judgment but asserts that the Court may enter judgment in its favor on Counts I and II without the need for a cross-motion. *See* Response to Defendant's Motion for Partial Summary Judgment, p. 1, n. 1 (Doc. 30). Fed. R. Civ. P. 56(f)(1) allows the Court to enter summary judgment in a non-movant's favor only "after giving notice and a reasonable time to respond." Defendant has not, however, raised any issues with respect to Plaintiff's assertion that no formal cross-motion is necessary. Also, both sides agree that the Court is presented with a pure issue of law in this motion, indicating that a grant of summary judgment to one side or the other is expected from both sides without further notice or opportunity for response.

> proved could result in coverage. The facts alleged in the complaint need not make out a claim that specifically and unequivocally falls within the coverage. Rather, "where the events giving rise to the complaint may be shown at trial to fall within the policy's coverage," an insurer must provide the policyholder with a defense.

*Mitchell,* 36 A.3d at 879 (quoting *AutoEurope, LLC v. Conn. Indem. Co.,* 321 F.3d 60, 68 (1st Cir. 2003)) (internal citations omitted). *See also Oxford Aviation, Inc. v. Global Aerospace, Inc.*, 680 F.3d 85, 87 (1st Cir. 2012). "'Precision' is not required in the complaint, and it is not necessary for determining a duty to defend. The correct test is whether a potential for liability within the coverage appears from whatever allegations are made." *Travelers Indem. Co. v. Dingwell,* 414 A.2d 220, 226 (Me. 1980).

The parties dispute whether any allegations in the *Coastwise* complaint could possibly relate to a Policy-covered "occurrence of harm risk" or whether, instead, the allegations relate exclusively to "business risks" undertaken by the Shipyard that are not covered under the Policy.

> An 'occurrence of harm risk' is a risk that a person or property other than the product itself will be damaged through the fault of the contractor. A 'business risk' is a risk that the contractor will not do his job competently, and thus will be obligated to repair or replace his faulty work. . . . A CGL policy covers an occurrence of harm risk but specifically excludes a business risk.

*Peerless Ins. Co. v. Brennon*, 564 A.2d 383, 386 (Me. 1989) (quoting Note, *Baybutt Construction Corp. v. Commercial Union Insurance Co.: A Question of Ambiguity in Comprehensive General Liability Insurance Policies,* 36 Me. L. Rev. 179, 182 (1984)); *see also Baywood Corp. v. Maine Bonding & Cas. Co.*, 628 A.2d 1029, 1031 (Me. 1993), ("What is insured . . . under the standard comprehensive general liability

4

policy is property damage resulting from an occurrence of harm occasioned by negligent workmanship. What is not insured is the repair or replacement of the faulty work.")

> Maine's Law Court has been careful to note, however, that:
>
> [t]he distinction between occurrence of harm risks and business risks is not a broad philosophical distinction in construing liability insurance coverage; [rather,] it relates to the meaning of certain standard business risk exclusions . . . .

*Mass. Bay Ins. Co. v. Ferraiolo Const. Co., Inc.*, 584 A.2d 608, 610 (Me. 1990). In other words, the language of the policy determines the coverage in every case rather than abstract concepts about what types of risk that policy should cover. Guided by this principle, the Court keeps the Policy language at the forefront of its analysis.

**I.    There is a Possibility that at Least Some of the Damage to the SHENANDOAH is Covered by the Policy**

The threshold question before the Court is whether any of the *Coastwise* claims fall within the Policy's general grant of coverage. The Policy provides liability coverage for:

> those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage" to which this insurance applies. . . . This insurance applies to . . . "property damage" only if: The. . . "property damage" is caused by an "occurrence". . . .

Policy, Section I Coverages (1)(a) and (b) (Doc. # 25-2).

The *Coastwise* complaint alleges that the SHENANDOAH, which is "tangible property," incurred physical injury (*e.g.* leaks and damage to hull planks that required replacement) and that Coastwise lost use of the vessel during a period of

5

inspection and repairs. The parties dispute whether the damage to the SHENANDOAH was the result of an "occurrence" or an "accident."[2]

The First Circuit in *Oxford Aviation* recently addressed the question of whether a crack in an airplane's window that appeared on its flight home from repairs was caused by an "occurrence" or "accident" under Maine law. The insurance company argued that the airplane owner's complaint could not be read "to allege 'property damage' that is caused by an 'occurrence.'" The First Circuit stated:

> Some courts have read the commonly used terms "property damage," "accident" or "occurrence" to exclude faulty workmanship by the insured entity, while others have looked instead to exclusions, common in CGL policies and present in [the insurer's] policy here, that are specifically directed to faulty workmanship. *Am. Home Assur. Co. v. AGM Marine Contractors, Inc. ("AGM I"),* 467 F.3d 810, 812-13 (1st Cir. 2006)(describing case law); *see also Sheehan Constr. Co. v. Cont'l Cas. Co.,* 935 N.E.2d 160, 167-69 (Ind. 2010). Neither party has cited a Maine case directly in point.
> Perhaps common parlance might not describe an uncomfortable seat (one of the problems alleged by [the airplane's owner]) as an "accident," but a sudden unintended crack in a plane window fits comfortably within that term. In all events, Maine construes coverage terms like "accident" or "occurrence" generously, *Me. Mut. Fire Ins. Co. v. Gervais,* 715 A.2d 938, 941 (Me. 1998); *Vigna v. Allstate Ins. Co.,* 686 A.2d 598, 600 (Me. 1996), in contrast to courts that rely on such terms to exclude coverage for faulty workmanship, *e.g. Lyerla v. AMCO Ins. Co.,* 536 F.3d 684, 689 (7th Cir. 2008); *Essex Ins. Co. v. Holder*, 370 Ark. 465, 261 S.W.3d 456, 460 (2008) (per curiam).

*Oxford Aviation,* 680 F.3d at 88. The First Circuit went on to discuss *Peerless Ins. Co. v. Brennon,* 564 A.2d 383 (Me. 1989), wherein the Maine Law Court, overruling an earlier decision, suggested that "at least certain kinds of harm from faulty

---

[2] "Property damage" is defined in relevant part as: "Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it . . . ." Policy, Section V Definitions (17). An "occurrence" is defined as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." Policy, Section V Definitions (13).

workmanship could come within the coverage of a CGL policy and even avoid its exclusions" if the faulty work caused an accident resulting in physical damage to others. *Oxford* Aviation, 680 F.3d at 88-89. The First Circuit concluded that "at least the damage to the plane's side window is within this coverage provision of the policy, and if the duty to defend in this case is negated, this would have to be because of the exclusions." *Id* at 89.

Oxford Aviation had a CGL policy with the same grant-of-coverage language as that found in the Shipyard's policy. Factually, the leaks which are alleged to have occurred on the SHENANDOAH are sufficiently like the airplane's cracked window to be considered an "accident" or "occurrence."[3] NAS protests that the leakage was not an accident because there was no "sudden" happening like the in-flight window crack in *Oxford Aviation*. It points to the narrative in the *Coastwise* complaint as demonstrating that the leaks occurred over time throughout the summer of 2008. This ignores the difference between the commencement of leaking and the continuation thereof. *See Dingwell,* 414 A.2d at 224. If "suddenness" is required to meet the definition of an "occurrence"—and the Court does not suggest that this *is* necessary under Maine law—the Coastwise complaint in no way eliminates the possibility that some of the leaks discovered throughout the summer of 2008 began at a particular moment in time. *See id.* It is reasonably possible that

---

[3] The Defendant cites *Friel Luxury Home Const., Inc. v. ProBuilders Spec. Ins. Co. RRG*, Doc. No. 09-cv-11036-DPW, 2009 WL 5227893, *5, (D. Mass., Dec. 22, 2009), for the proposition that "faulty workmanship fails to constitute an accidental occurrence in a commercial general liability policy." While *Friel* may reflect the law as it is developing in Massachusetts, *Oxford Aviation,* which employs Maine law, controls in this case.

7

the leaking at some point—"suddenly"—began to occur as the SHENANDOAH underwent the rigors of her summer voyages. That a proximate cause of the leaking may have been faulty workmanship is immaterial. A proximate cause of the window crack in *Oxford Aviation* is alleged to have been the insured's faulty workmanship.

NAS also suggests that the leakage did not cause any additional damage to the vessel, but rather that it was merely a symptom of the damage caused to the vessel's structural integrity by the Shipyard's work. Here again, NAS ignores the reasonable possibility that the leaking may have caused additional damage to the SHENANDOAH in any number of ways. Although the complaint is fairly specific with respect to the ways in which the Shipyard's workmanship was faulty, it does not exclude claims for damages caused by leaking of the vessel after it was put back into service. Indeed, the complaint's reference to damages including "repair and restoration of the vessel" is broad enough to reasonably encompass any number and kind of damages, including replacing materials or repairing finishes not touched by the Shipyard but ruined by the leaking. Accordingly, at least a portion of the *Coastwise* complaint's allegations may fall within the Policy's broad general grant of coverage. The elimination of any possibility of coverage must therefore rest on the Policy's exclusions. *See Oxford Aviation*. 680 F.3d. at 89.

## II. The Exclusions Do Not Eliminate the Possibility of Coverage

The Policy contains several "business risk" exclusions, three of which NAS contends preclude coverage for the *Coastwise* complaint. "Because the duty to defend is broad, any ambiguity in the policy regarding the insurer's duty to defend

8

is resolved against the insurer, and policy exclusions are construed strictly against the insurer." *Mitchell*, 36 A.3d at 879. (citations omitted).

    a. <u>Exclusion (j)(4) − Care, Custody, or Control</u>

NAS contends first that Policy exclusion (j)(4) precludes coverage in this case. This exclusion states in pertinent part, "This insurance does not apply to . . . '[p]roperty damage' to . . . [p]ersonal property in the care, custody or control of the insured." The *Coastwise* complaint is explicit about the fact that it delivered possession of the SHENANDOAH to the Shipyard for repairs and that the vessel was damaged as a result of the Shipyard's faulty repairs. These allegations implicate the care, custody, or control exclusion. The Court agrees with NAS (and the Shipyard does not disagree) that this exclusion applies to all "property damage" incurred while the SHENANDOAH was at the Shipyard, regardless of whether that damage was discovered before or after the vessel was returned to Coastwise.

However, NAS's claim that "any physical injury to the vessel, as alleged in [the] complaint, occurred during the time she was in the care, custody, or control of [the Shipyard]", Motion for Partial Summary Judgment, p. 15, disregards allegations in the complaint that imply at least the possibility that the SHENANDOAH sustained additional damage after Coastwise regained possession. In particular, the *Coastwise* complaint describes flooding of the vessel after she was put back into service. While the flooding is alleged to have resulted from the Shipyard's faulty repairs, it did not occur while in the Shipyard's care, custody or control. The flooding may turn out to have caused minimal or perhaps even no

additional damage to the SHENANDOAH, but the potential exists from the allegations of flooding that some portion of Coastwise's damages arose out of damage the SHENANDOAH sustained after it left the Shipyard's care, custody, and control. Collateral damage from flooding might have included, for instance, warping, mold, damage to finishes, or damage to electrical systems. Although the *Coastwise* complaint does not specifically allege these facts, under Maine law, the Court is directed to consider what Coastwise could potentially establish at trial within the causes of action it has asserted. *See Mitchell,* 36 A.3d at 880-881; *Oxford Aviation,* 680 F.3d at 89; s*ee also Maine Bonding & Cas. Co. v. Douglas Dynamics, Inc.*, 594 A.2d 1079, 1081 (Me. 1991) (finding a "remote" possibility of coverage under the complaint's allegations sufficient to invoke the duty to defend). Exclusion (j)(4) thus does not exclude the possibility of coverage for at least some of Coastwise's alleged damages.

    b. <u>Exclusion (j)(6) − Faulty Workmanship</u>

For reasons similar to those articulated in the analysis of exclusion (j)(4), NAS's claim that exclusion (j)(6) precludes coverage fails. Exclusion (j)(6) states:

> This insurance does not apply to . . . "Property damage" to . . . That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it. . . . this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

The "products completed operations hazard" is defined in relevant part as:

> "property damage" occurring away from premises you own or rent and arising out of . . . "your work" except . . . work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times: (a) When all of the

> work called for in your contract has been completed. . . . Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

Policy Section V Definitions (16). The *Coastwise* complaint alleges that the Shipyard's faulty workmanship required Coastwise to repair and restore the SHENANDOAH, implicating this exclusion. However, the exception to exclusion (j)(6), for property damage included in the "products-completed operations hazard," saves coverage for any "property damage" to the SHENANDOAH occurring away from the Shipyard's premises and after its work had been completed.

The Court again returns to the *Coastwise* complaint's allegations that after the SHENANDOAH was returned to service it flooded. This flooding occurred away from the Shipyard and after it had completed its faulty repairs. The *Coastwise* complaint expressly did not limit its damages and sought damages for the cost of repair and restoration of the SHENANDOAH. Such restoration could potentially have included collateral damage caused by the flooding. Because the *Coastwise* complaint alleges "property damage" at least partially within the "products-completed operations hazard," exclusion (j)(6) does not, on its own, preclude any possibility of coverage under the Policy. *See Oxford Aviation*, 680 F.3d at 90.

    c. <u>Exclusion (m) − Property Damage to Impaired Property</u>

NAS claims, finally, that exclusion (m) precludes coverage in this case, either on its own or together with exclusion (j)(6). Exclusion (m) states in pertinent part:

> This insurance does not apply to . . . "Property damage" to "impaired property" or property that has not been physically injured, arising out of:

11

>> (1) a defect, deficiency, inadequacy or dangerous condition in . . . "your work" . . .
>
> This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to . . . "your work" after it has been put to its intended use.

"Impaired property" is defined in pertinent part as:

> Tangible property, other than . . . "your work", that cannot be used or is less useful because:
>
>> a. It incorporates . . . "your work" that is known or thought to be defective, deficient, inadequate or dangerous; . . .
>
> if such property can be restored to use by:
>
>> a. The repair, replacement, adjustment or removal of . . . "your work" . . . .

Policy Section V Definitions (8).

Commentators have criticized exclusion (m) as being ambiguous. *See* Scott C. Turner, *Insurance Coverage of Construction Disputes* § 26.1, n. 4 (2012) (citing secondary sources describing exclusion (m) as "complicated," "confusing," and "incomprehensible"). Although the exclusion is difficult to understand, the parties agree that it does not exclude coverage for physical injury to the larger entity into which the work was incorporated. Rather, it excludes coverage only for replacing or repairing the defective work itself. *See* Plaintiff's Response to Defendant's Motion for Summary Judgment, p. 23 (Doc. 30), Defendant's Reply in Support of Summary Judgment, p. 7 (Doc. 35).[4] This common point of interpretation resolves the question

---

[4] NAS states: "The key to understanding Exclusion m is that it draws a distinction between the insured's product or work and the larger entity in which it is installed or performed. If the insured's defective product or work causes physical injury to that larger entity, then the physical

12

of the potential for coverage in this case, as the *Coastwise* complaint does potentially allege damage to the SHENANDOAH outside of the faulty work itself.

## CONCLUSION

This case is squarely aligned with *Oxford Aviation*. As the First Circuit recognized:

> [I]t seems unlikely that there will be much, if any, indemnification since most of the claimed injuries appear likely to be covered by exclusions. But the duty to defend is triggered by any realistic possibility of any damage that might be within coverage and outside the exclusions . . . .

*Oxford Aviation*, 680 F.3d at 92. Because there is a realistic possibility of damage outside exclusions (j)(4), (j)(6), and (m), the Defendant's motion for partial summary judgment is **DENIED**, and Plaintiff is **GRANTED** partial summary judgment on Counts I and II of the Complaint.

With respect to Count II, the Court **DECLARES** that Defendant North American Specialty Insurance Company has, under the terms of its policy of insurance with Plaintiff Boothbay Harbor Shipyard, LLC, a duty to defend Plaintiff in the action entitled *Coastwise Packet Co. v. Boothbay Harbor Shipyard, LLC*, Doc. # 09-10228-GAO (D. Mass.).

SO ORDERED.

/s/ Nancy Torresen  
United States District Judge

Dated this 30th day of August, 2012.

---

injury to the larger entity is covered under the CGL policy even though the cost of replacing or repairing the defective product or work is not."